1  JAMES PHILLIP VAUGHNS, CSBN 124040
   Law Offices of James P. Vaughns
2  6114 LaSalle Avenue, Suite 289
   Oakland, California  94611
3  Telephone:    510-583-9622
   Fax:          510-735-8658
4  Email:        vaughnslaw@aol.com

5  Counsel for Defendant
   DAMIEN EDWARD McDANIEL

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         OAKLAND DIVISION

11  UNITED STATES OF AMERICA,       )      No. CR 13-00818 PJH
                                    )
12          Plaintiff,              )      SENTENCING MEMORANDUM
                                    )
13      v.                          )      Date:   September 20, 2017
                                    )      Time:  1:30 p.m.
14  DAMIEN EDWARD McDANIEL,         )      Hon. Phyllis J. HAMILTON
                                    )
15          Defendant.              )
    _____)

16

17                           **INTRODUCTION**

18      Damien McDaniel was arrested on January 22, 2013, for one of the events leading to the

19  instant Indictment and has remained in custody since. He was initially charged in Alameda

20  County Superior Court. However, after a preliminary hearing in state court, the matter was

21  dismissed in favor of federal prosecution in 2014.

22      He entered guilty pleas on April 27, 2017 to Racketeering Conspiracy -18 U.S.C. §1962(d),

23  Attempted Murder in Aid of Racketeering -18 U.S.C. §1959(a)(5),  Assault with a Dangerous

24  Weapon in Aid of Racketeering -18 U.S.C. §1959 (a)(3), and Possession/Brandish/Discharge

25  of a Firearm in Furtherance of a Crime of Violence -18 U.S.C. §924(c)(1)(A).

26      The  Presentence Report ("PSR") correctly calculates the Adjusted Offense Level at 34, and a

27

28

Criminal History Category of V. The resulting guideline range is 235 to 293 months. Count 6 requires a 10-year sentence consecutive to all other counts. The minimum sentence the Court can apply is 10 years, 3 days. Dean v. United States, (2017) 581 U.S. ____ . The PSR recommends a sentence of 360 months. The plea agreement allows the parties to argue for a sentence between 27 and 33 years (324 and 396 months). Pursuant to the agreement, Mr. McDaniel cannot argue for any less than 324 months. Sentencing is scheduled for September 20, 2017 at 1:30 p.m.

## ARGUMENT

### District Courts Have Both the Authority and the Responsibility to Exercise Their Judgment and Discretion in Arriving at the Appropriate Sentence

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), dramatically altered the district court's role in sentencing. The Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564. While "district courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. 264), district courts "may not presume that the Guidelines range is reasonable," *Gall*, 128 S. Ct. at 596-97; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). After *Booker*, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. § 3553(a)). The Guideline range is only one factor for the district court to consider in making this judgment, and it may not be weighed more heavily than any other factor. *Id.*

In *Gall*, the Supreme Court held that appellate courts cannot require that "a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary

circumstances." 128 S. Ct. at 591. The Court likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. Rather, it is within the district court's discretion to arrive at an appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range." *Id.* at 591.

## FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE

The primary directive in 18 U.S.C. § 3553(a) is for sentencing Courts to impose a sentence which is sufficient, but not greater than necessary, to comply with the above objectives of sentencing. As noted, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).  In determining a minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider certain factors, particularly the following:

### (1) Circumstances of the Offense and Characteristics of the Defendant

Damien Edward McDaniel is a 27 year old child in an adult world. His early life was chaotic and dysfunctional. PSR, ¶ 66. It led him inexorably to make the terrible choices that bring him before this Court to face an unpleasant future regardless of the Court's sentence. The PSR accurately describes the facts of the offense and Mr. McDaniel's past, but does not come close to describing the person that Mr. McDaniel is today.

The undersigned met Mr. McDaniel at the inception of this matter in 2014. Several things stood out about him. He was impulsive and quick to react to even the most benign stimuli. He also had strong opinions about many topics. Unknown at the time was the fact that he suffered from PTSD. ***See Exhibit 1***. Over the many, many hours spent with him, observable change was noted. Most strikingly, Mr. McDaniel changed his view of the world and it all appeared to stem from his changed view of his son's custody circumstances.

Initially, Mr. McDaniel expressed very negative opinions about the fact that his son was in the foster care of two men. That those men were an interracial couple where neither was African-American also caused him concern. Today, Mr. McDaniel enjoys a very warm relationship with

3

both men and fully supports the fact that his son is fortunate enough to have loving foster parents who have provided for his son in so many ways that he could not have. ***See Exhibit 2.***

Mr. McDaniel has also shown much progress in harnessing his energy and channeling it into productive areas. Bible study is one such area. ***See Exhibit 3***. Obtaining his GED was another. See ***Exhibit 4.*** He has been able to have a positive impact on other inmates around him by demonstrating that he can think first - chose to react or not later. ***See Exhibit 5.***

While the ability to change is thought to be present in most people, the current state of affairs in the United States and the seemingly rampant and intractable polarization would tend to cast doubt on that proposition. That Mr. McDaniel has changed his positions on issues that many Americans apparently cannot speaks volume about him and about his prospects for the future. He understands that he must be punished for his actions and he deservedly faces many years of incarceration. However the Court must also consider the fact that he will be released from custody at some point. His demonstrated ability to change should give the Court some confidence that pronouncing the least onerous sentence will not be a mistake.

The PSR notes that the recommendation of 360 months is based on a perceived lack of remorse. The circumstances of an in-custody probation interview - with limited time and in cramped quarters - certainly are not optimum for discerning the character of a person or the depths of the person's contrition.

Mr. McDaniel's own words do, however, give a true litmus test of his feelings about his actions in these offenses. ***See Exhibit 6.*** He could not have written these words in 2013 or 2014. It took time for him to turn his focus inward and, it seems harsh to say, being in Administrative Segregation helped in that regard. These letters contradict the impression of the USPO that he was "barely apologetic." That there remain mistakes in the PSR - namely the fact that paragraphs 50 and 51 incorrectly detail the same facts for 2008 and 2011 incidents - is evidence that we are all imperfect.

While the PSR and the Psychological Evaluation note that he had few positive role models as

a child, his father has overcome many of his personal demons and has become a productive member of society. He, too, has seen change in Mr. McDaniel. *See Exhibit 7*. Even the mother of Mr. McDaniel's son has taken the time to write a letter of support for Mr. McDaniel. *See Exhibit 8.*

The undersigned referred to Mr. McDaniel above as a 27-year old child in an adult world. The reason for that is because Mr. McDaniel was - at the inception of this case - very much out of touch with the world most of us exist in everyday. Counsel, in preparation for a prior bond hearing, sent in a job application to Cost Plus World Market for Mr. McDaniel. *See Exhibit 9*. When counsel told Mr. McDaniel that he had been selected for an interview, Mr. McDaniel was filled with wonderment - truly like a child at Christmas. He had no idea of how to get a job or how simple it was to apply for one. From that point forward, Mr. McDaniel began to see that things that he thought only "other people" could do were not beyond his capabilities.

Mr. McDaniel has never seen snow before, never been to the ocean, never explored the world beyond East Oakland. However, having opened his mind and imagination, he has become a student of life. He has joined the Commonweath Club and eagerly awaits their monthly magazine. *See Exhibit 10.* He has found himself in the previously unexplored position of setting goals for himself. He has become intrigued with rowing across the Pacific after learning about Lia Ditton and her quest to become the first woman to row from San Francisco to Japan. *See Exhibit 11*. He plans to beat her time and distance upon his release from prison. In the realm of alleged gang member goals, this must count as one of the most unusual ever. However, it is just the beginning for Mr. McDaniel. He also wants to ride a bike along the Great Wall of China. These goals may seem of no consequence given his expected sentence. However, the very existence of these goals speaks to the change in him and to his particular circumstances as they relate to determining a sentence under *Booker*.

Instead of applying himself to getting high, he has applied himself to planning for his future by drafting business plans and developing a strategy for success upon his release from custody. *See Exhibit 12.*

Mr. McDaniel cannot ask for less than the 27 years provided for in the plea agreement. He understands that his exposure could have been higher had the Government not entered into the instant agreement. However, the 360 months that the PSR recommends is not a reasonable sentence given the demonstrable change Mr. McDaniel has exhibited and the truthful expressions of remorse his letters provide.

This memorandum has not addressed in detail the offense conduct. That conduct is indefensible and nothing written here excuses it. Officer Karsseboom and Raven Burnette will never be the same because of Mr. McDaniel and he has to live with, and pay for, that. The change that this memorandum does address does not minimize the criminality of the past conduct, but it does address the future and the version of Damien McDaniel that will emerge from prison one day. The ruthless, impulsive, and violence prone person of 2013 does not exist anymore. Replacing that person is someone who has the best wishes of many people who could easily have refused to give him the time of day, from his son's foster parents to the paralegal who spent time reviewing evidence with him. ***See Exhibit 13.*** I am not ashamed to say that I consider him more than just a client and I've promised him that I will be happy to shadow him on his trip across the Pacific someday.

## CONCLUSION

Mr. McDaniel stands before the Court recognizing that he broke the law and that severe punishment must ensue. He cannot ask for less than 27 years in custody. A reasonable sentence in this case will be based on both Damien McDaniels - the pre-offense criminal and the post-offense work-in-progress. He is confident the Court will not throw the baby out with the bath water by simply assuming that he is a throwaway creature of the streets who must be warehoused away forever. He has always had the potential and native intelligence to be so much more than he

>>

>>

>>

was. The difference is that now, for the first time, he believes it.

DATED: September 13, 2017                    Respectfully submitted,


                                             *-S- James Phillip Vaughns*
                                             _____
                                             JAMES PHILLIP VAUGHNS.
                                             Attorney for Defendant McDANIEL

# EXHIBIT 1

**Scott Lines, Ph.D.**
*Licensed Psychologist  PSY 14167*
**2415 Webster Street, Berkeley, CA 94705**
**510.644.2396 (phone & fax)**

**Psychological Evaluation**

| | |
|---|---|
| **Client:** | Damien Edward McDaniel |
| **Date of Birth:** | 12-02-89 |
| **Date of Interviews:** | 08-10-17 |
| **Date of Report:** | 08-17-17 |
| **Referred by:** | James Phillip Vaughns, Attorney at Law |

**Reason for Evaluation**
Attorney James Phillip Vaughns requested this evaluation of his client, Damien McDaniel, for the purpose of assessing his current mental status and retrospectively assessing his mental and emotional condition at the time of his offense conduct.  My understanding is that Mr. McDaniel has been charged with Racketeering Conspiracy, Attempted Murder in Aid of Racketeering, Assault with a Dangerous Weapon, Maiming in Aid of Racketeering, Use of a Firearm in Furtherance of a Crime of Violence, and Felon in Possession of a Firearm.  He has pleaded guilty to some of these charges.

**Procedures**
I conducted a clinical interview with Damien McDaniel at the Glenn Dyer Detention Facility in Oakland on August 10, 2017.  His attorney was present for the first third of the meeting.  In addition to clinical interview, I reviewed the following documents provided by his attorney:

1. The Presentence Investigation Report, dated July 19, 2017, 19 pp.
2. Copies of search warrants dated January 22 & 25, 2013, 23 total pp.
3. A copy of a letter written to the court by the defendant's son's adoptive parents, undated, 1 pp.

**Please note that a summary of the clinical findings of this evaluation may be found beginning on p. 5 of this report.**

**Appearance and Mental Status**
Damien McDaniel presented in this interview as a short-statured African American man with numerous tattoos, dark curly hair and slight facial hair.  No evidence of thought disorder, i.e. hearing voices or delusional thinking, was noted.  His mood was variable but within normal limits.  His language skills were normal and he appeared of normal intelligence.  On several occasions, he dramatically re-enacted traumatic events he has experienced, suggesting these events remained unprocessed in his psyche, affecting his judgment and actions.  His memory was unimpaired, and significantly heightened for traumatic events, as if they had just happened, rather than occurring several years ago.  This, like his dramatizations,

appeared to be colored by his exposure to trauma.

Mr. McDaniel conducted himself in this interview without hesitation or evasion, and with no effort observed to manipulate the interview to present himself in either a more negative or more positive light.  As such, I consider his statements to be accurate renderings of facts as he remembers them.

## Personal and Family History

Damien McDaniel was born a full-term baby in Oakland at Summit Hospital on December 9, 1989.  His parents were living together and unmarried at the time of his birth.  His father, Lynn McDaniel, 51, now lives in Richmond and drives for Uber; his mother, Deborah Young, is in her 50's and works in the kitchen of a convalescent hospital.  His older brother, Logan Johnson, 38, born from a different father, lives in Pittsburg and works in delivery for Amazon.  He has two other siblings from his father's relationships with other women: Dominique McDaniel, 28, is a janitor at Travis Air Force Base; and Sade McDaniel, 20, works as a hair stylist.

His father used and sold drugs through much of Mr. McDaniel's childhood, finally attaining sobriety after being severely injured by gunfire when Mr. McDaniel was 16.  The Presentence Investigation Report references his father's extensive criminal record.  Because of his own drug use, Mr. McDaniel is able to recognize that his father smoked crack cocaine and used heroin.  "He was always asleep, always sweating, always hustling for the next fix," he said.  He does not remember his parents being together.  He knows his father spent some time in custody but couldn't say when, nor the length of time he was away.  "He was in but he was out," he said.  "I'd see him every weekend for a few minutes, then he was gone.  He was in his addiction."  His mother grew tired of his father's drug use and finally ended their relationship.  Mr. McDaniel related a memory of his father being put in the back of a police car; he tried to open the door to free his father, but the door was locked.  He stated he felt like he couldn't help his father, which saddened him.  He considers his father one of his primary role models, yet he also rejected him in early adolescence.  He described their complicated relationship as follows:

> For a minute I was real rebellious in my early adolescence, trying to shake him off, telling people I had no daddy.  Probably resentment for him not being there much when I was younger . . . thinking I'm all grown and don't need him.

By contrast, Mr. McDaniel always felt his mother was present throughout his childhood, providing him with food, clothes and other basic needs.  But it appears that she didn't know how to handle his adolescent rebellion, and by the age of 14 he was on the streets all night.  "She was worried, but I kept doing it," he said.  "Eventually she said, 'If you're staying out, then stay out.'"  This freedom had a negative impact on his academic performance.  He went to Horace Mann Elementary School and had a few problems, fighting and causing disruptions in class.  Teachers

suspected he had ADHD, but he was never evaluated nor offered medication treatment.  By middle school at Calvin Simmons, he was failing to turn in homework and falling behind in classes.  His mother arranged her work schedule to allow her to get off work by the time he got home from school, but her presence at home was not sufficient to undo his identification with his criminally inclined father and paternal uncle.  He considers his mother's boyfriend, Nelson Harris, to be a positive role model, but by the time he was 14 their relationship ended.

By the time he was in high school, his behavior deteriorated to the point that regular school settings could not contain him.  He went to Fremont High School for 20 days, but was expelled for throwing a stapler.  Transferred to Oakland Community Day School, he lasted two-and-one-half months before being removed for assault, which landed him in juvenile hall for two weeks.  Following that, he attended Rock LaFlesch Community Day School, but was expelled after three days for threatening a teacher; he was placed back in juvenile hall.  He was sent to a group home in San Jose and attended Campden Community Day School, but he went AWOL after one month.  He was finally placed in Trinity Whitewater boys ranch in Southern California, where he resided for almost nine months.  This was an idyllic change for him, a setting he described as being like a college campus, with a swimming pool, basketball courts, game room, movie room and a staff psychologist.  He played basketball and football and learned how to swim.  Yet his behavioral dyscontrol continued, with many incidents of fighting, smoking and leaving his housing unit.  He AWOL'd with a mere two weeks to go before his placement ended.  While the timing of this AWOL suggests he was anxious about this idyllic placement ending, his rationale for walking out of the program was his resentment at getting only two home passes during the placement.  In describing his state of mind at the Trinity program, he stated, "Now I'm cool, but back then I used to be real wild, rebellious, not listening, fighting in front of staff.  The staff would say I'm going crazy."  He turned 18 shortly after leaving the program; once back in Oakland, he was arrested within seven months in an auto theft that ended in a high-speed chase.

When I reflected in our interview on Mr. McDaniel's apparent problems with anger, he offered this understanding of his childhood propensity for angry outbursts:

> Back then, I've always been short, and my mother told me if someone touches you, you hit their ass back.  If I got into it with someone, I'd always take it to next level.  I had to show them not to pick on the little guy, there's more to this little guy than what y'all think.

**Exposure to Traumatic Events**
Damien McDaniel has an extensive history of exposure to life-threatening traumatic events that reside in his psyche as overwhelming, unmetabolized experiences.  By unmetabolized, I mean that the experiences have not been broken down by thinking and reflecting within oneself, nor communicated with understanding others, nor placed in a rational context; they instead reside as unbidden memories that flood

him in the form of nightmares, flashbacks, and "re-enactments," such as his elaborate acting out the traumatic things that have happened to him.  These re-experiencing events are accompanied by responses of the sympathetic nervous system, i.e. hyperarousal, hypervigilence, nervousness, sweating and the like; he reports suffering these PTSD symptoms both currently and when he was on the streets.  He is positive for diagnosis of posttraumatic stress disorder, which is now a chronic condition in this man.

The following is only a partial list of these traumatic events; he gave the impression that these were but examples of traumatic experiences that came immediately to mind in the interview and not a complete inventory of the bad things that have happened to him.  He mentioned the following incidents:

- At the age of eight, he was riding his bike at his father's house when he saw an argument between two men that resulted in one man shooting and killing the other.  He witnessed the shooting and the man dying.  He avoided that spot in the neighborhood, and said, "Even if I'm not looking at that spot, it's in my head."
- At 15, an acquaintance of his was boxing for sport and got the best of his opponent, who soon thereafter came back with friends and killed his acquaintance.
- In a drive-by shooting incident, he was standing next to a friend in West Oakland when bullets flew past him and landed in the wall beside his head.
- At 16 he was robbed at gunpoint while standing on the street with his cousin, who was showing him pictures of his new baby.  The robber thought he was a pimp with money.  This was the first time a gun was pointed at him.  "That definitely put a fear in me," he said.  "Things started to bother me then."
- While crossing a street in Oakland, a man came walking down the middle of the street shooting a gun.  He froze, fell to the ground and crawled away, feeling he might be killed.

It is worth noting that PTSD is worsened both in symptom manifestation and prognosis if the trauma experienced is human-caused, as opposed to a natural disaster, because of the betrayal of human trust that accompanies human-caused trauma.  His traumatic experiences fall into the former category, thus worsening the clinical manifestation in this man.

**Drug and Alcohol History**

Mr. McDaniel has used marijuana regularly since the age of 14; his first use of the drug was at the age of ten.  He was using heroin and cocaine on a regular basis since 17, snorting these drugs; he was considering injecting heroin just before he was arrested.  He had also just started using methamphetamines before being incarcerated.  In other words, it appears that his drug use was on the increase before he was arrested.  He doesn't consider himself to have a drug problem

presently, but admits his use was becoming more of a problem at the time he was arrested.  He was high on methamphetamine at the time of his arrest.  He stated he is open to drug programs while in custody.

**Clinical Opinion Regarding Mental and Emotional Condition as it Relates to Offense Conduct**

It is my clinical opinion that Damien McDaniel's troubles, including his acknowledged offense conduct, originated in two psychological factors, those being the family environment and larger community environment in which he was raised, and his unmistakable posttraumatic stress disorder derived from this environment. These will be examined in turn.

Regarding the first of these psychological factors, his familial and community environment, Mr. McDaniel's life originated in an arena of depravity, lack of parental control and exposure to violence.  Because the so-called war on drugs resulted in a large percentage of adult males being incarcerated, his father's drug addiction meant he was either actively using drugs or serving time in prison for his drug involvement.  His relationship with his father was constantly impacted by his father's drug-related lifestyle, providing a confusing combination of idealization of his father because of what he considered his father's exciting life, mixed with resentment and rejection of his father because of the latter's overall absence in his life.  The result for Mr. McDaniel was an unconscious identification with his father's lifestyle, using drugs, being "bad" and pursuing "females" as his father did, while also rebelling against any strictures on his behavior.  This identification was so strong that once his father got clean of his drug habit, Mr. McDaniel found himself wishing that his father was still using drugs and pursuing women so that they could share these interests.  In essence, his absent cum provocatively present father set the model for an anti-authoritarian figure who showed him what "bad" looked like, and the young Mr. McDaniel simply followed suit—prioritizing life on the streets over academics, discipline and responsibility.  His paternal uncle, a man sentenced to 30 years in prison for murder, was another of his stated role models.  So where in his home life was he going to find a model of responsibility and discipline?

What about his mother?  She appears in his narrative as a well-meaning but ineffectual figure whose maternal authority collapsed in the face of her son's rebellion, as she ceded control of him by saying, "If you're going to stay out on the streets at night, then stay out."  In essence, with this he was given license to be free and uncontrolled.  His early criminality was certainly driven by anger, but in my estimation his anger was not only because of his short stature and resulting need to manifest a tough exterior, but also because he was furious at his parents, his teachers, and by extension, at society for not effectively teaching him how to behave, and for not showing him that there were good things to strive for in life through legitimate effort.

The second psychological factor involved in his offense conduct is his severe and chronic PTSD.  The Seminary neighborhood of Oakland can rightly be described as a war zone for the young men involved in selling and using drugs, with turf lines, allies and enemies as well defined as between warring nations.  As outlined in the "Exposure to Traumatic Events" section, he was exposed to life-threatening trauma beginning at the age of eight, when he saw a man get killed.  At 15, an acquaintance was shot and killed.  His exposure to trauma worsened when bullets landed next to his head in a drive-by shooting, and worsened still when he was robbed at gunpoint. He felt that death, which surrounded him in his neighborhood, was coming in closer and closer, such that during the time period of his offense conduct he often felt he would be killed by "enemies."  He said, "That's why I keep a gun, there's people really trying to kill me, specifically me.  Dudes see me and start shooting.  Why?  I'm guilty by association, my friend does something and he's my friend, so they come after me."

From this statement and from his acceptance of responsibility for the offense conduct cited in the Presentence Report, it is clear that in 2013, Damien McDaniel was wary of being killed by rival "enemies" and thus was ready to defend himself.  It is also clear that he was prepared to for retribution, including inflicting bodily harm and possibly death, to those who had acted aggressively toward his friends.  What this report emphasizes is that this aggressive stance was not only a willful disregard for life, but also a PTSD re-enactment response to perceived threats driven by his autonomic nervous system, essentially a heightened state of alertness leading to a "fight or flight" response.  Regarding his involvement in shooting the undercover officer while trying to take his gun, he reported that when he heard that the man whom he thought was a sneaky assailant had a gun, he felt an adrenaline rush, shaking hands and accelerated heart rate.  These are all signs of an activated autonomic nervous system related to his mental disorder of PTSD, which overwhelmed his better judgment.  In fact, his judgment, clearly impaired during the events of January 2013, was chronically overwhelmed by the same factors throughout his adolescence and into his twenties, such that when his teachers at the Trinity boys' ranch thought, by his account, that he was "crazy," they were correct— he did suffer then from chronic PTSD, as he does now.

Certainly, Mr. McDaniel is no angel.  It does appear that his time in custody, and the enforced sobriety of custody, has allowed him to recover his impaired judgment.  When I described in this interview the "eye for an eye" stance he felt he had to take in his neighborhood, he reflected on how that has changed in his mind, as follows:

> I felt that way then, now I feel it's not my job to take matters in my own hands.  Now I be feeling like if I do something [aggressive] to someone who did something, that's like taking God's place.  It's God's job to right the wrongs.  If someone do something to one of my friends, that's my friend's business. I got a son and a family, I can't be doing that stuff man.

In its adjudication of Damien McDaniel, the court may wish to consider that this man is capable of change, including adjusting his stance regarding retaliation for perceived wrongs in his community and adjusting his lifestyle to include sobriety. He is aware that some people use drugs in prison, but he has avoided that and plans to continue. He is interested in drug counseling to help him understand and address the issues underlying his previous use, and interested in psychotherapy to address his PTSD. It does appear from his early use of marijuana (age ten) that he has relied on substances not only because of the enjoyment they afforded him or because of his identification with his father or older peers, but also to self-medicate his severe anxiety. It is worth remembering that PTSD, while now in its own diagnostic category within DSM-V, was for a long time classified as an anxiety disorder; the autonomically-driven anxiety within PTSD is severe by any measure, and Mr. McDaniel was never treated for this debilitating condition. At the court's discretion, this medical fact should be taken into consideration in sentencing this man.

Finally, this man's family is supportive of him. His father, originally a poor role model, now is in the position of positively influencing him through his sobriety and his involvement in community-based drug treatment and violence prevention. The fact that Mr. McDaniel is himself a father is also an organizing influence in his life. A significant sign of his ability to reflect on his life and change his attitudes is seen in his relationship with his son's adoptive parents, a gay couple living in Oakland. Mr. McDaniel was originally opposed to his son being raised by two men. However, upon seeing the loving stability they are providing his son, Damien Jr., he has completely reversed his opposition. He now has a good relationship with these two men and corresponds with them regularly, as well as with his son. For their part, the adoptive parents, Scott Hofmeister and Brian Wong, view Mr. McDaniel as taking responsibility for and regretting his previous life choices.

I will add that Mr. McDaniel expressed in this interview that following his term of custody, he hoped to start a non-profit organization dedicated to helping urban youths to avoid the pitfalls that have brought him before the court on this matter. In this way, he is using his father's example of a man who came to terms with his damaging lifestyle; he hopes to have a positive impact on such youths in the future, stating, "I've been there, I'm just like them."

**Diagnostic Impression** (DSM-V)
Posttraumatic Stress Disorder, chronic

**Recommendations**
I found Mr. McDaniel quite interested in talking to me about his life and traumatic experiences in this interview, which I judge to be prognostically a good sign that he could benefit from psychotherapy in custody. He should also be offered drug counseling. He also needs a medication evaluation; he has been asking for medication help for insomnia, but has not been offered any medical assistance for this problem. This insomnia is another manifestation of his PTSD that would benefit

from medical attention.

I hope this evaluation will assist the court in its adjudication of this man.  I am available for discussion of these findings, should that be necessary to clarify any aspect of this report.

Sincerely yours,

Scott Lines, Ph.D.
Clinical Psychologist

# EXHIBIT 2

May It Please the Court:

We are writing in support of Damien McDaniel (Damien Sr.) for his sentencing hearing on August 23, 2017.  Damien's biological son (Damien Jr.) was placed with us at the age of 3 through the Alameda County Foster Care System in July 2012.  In July 2014 we adopted Damien Jr. and we began corresponding by mail with Damien Sr.  We have been exchanging letters with Damien Sr. three to four times a year since then.  We have been updating Damien Sr. on the progress of Damien Jr. and Damien Sr. has been keeping us up to date on the proceedings of his case.  Damien Sr. also corresponds with Damien Jr. through the mail by letter and occasional drawing.

In addition to corresponding with Damien Sr., we have attended two of his bail hearings, so we are familiar with the list of crimes of which Damien has been accused and have heard some of the evidence offered by the prosecutor.  We have also met Damien Sr.'s father (that is, our son's paternal grandfather) and are aware of some of the challenges that Damien Sr. faced as a child growing up.  We are also aware of how Damien Sr. has managed to persuade his friends and family, while in detention, that he has turned over a new leaf and is worthy of their trust.

Based on our correspondence with Damien it is clear to us that Damien accepts responsibility for and truly regrets the choices that have led him before this court.  Damien's letters to us have been consistently modest, respectful, and grateful.  He has approached our unusual relationship very thoughtfully and with considerable concern for what is best for Damien Jr. and how he can be supportive to us in raising Damien Jr.  His letters have also been very gentle and optimistic, especially given the particulars of his situation.  His correspondence with Damien Jr. exhibits inquisitiveness, empathy, encouragement and a desire to use his life story as an example so that his biological son does not repeat his mistakes.

Damien and his attorney have shared with us the broad outline of the plea agreement.  If approved, we find it tragic that someone as young as Damien Sr. will end up spending so much time incarcerated.  While we understand the crimes of which Damien is accused are quite serious, his conversion seems to us quite genuine, and it is our hope that Damien will get a second chance to be a productive and contributing member of society sooner rather than later.

If there is any additional information that we can provide in support of Damien's cause we would happily do so.  We can be reached via email at rockridge8888@gmail.com or by mail at P.O. Box 5264, Berkeley, CA 94705-2606.

Sincerely,


Scott Hofmeister & Brian Wong

# EXHIBIT 3



*New Life Church of God in Christ*

"The Church where New Life begins
and old lives become testimonies."
4450 International Blvd.
Oakland, Ca 94601

(510) 536-8410 Church
(510) 978-1021 Cell

August 5, 2013

email: newlife4@pacbell.net

To Whom It May Concern:

My name is Reverend Daniel Stevens, I am the Pastor of New Life Church of God in Christ and I am also a Chaplain with North County Jail. I am writing on the behalf of Damien McDaniel who is appearing before you today.

I have known Damien for several years. During the past 6 months he has accepted Christ as his personal Savior. He has also shown concern for his family and especially his son who he realizes needs him at this time. Due to his drug addiction he has done some unlawful things that was unlike his character.

As a Pastor, I know that the Lord can change people and I believe that he can and has changed him. Damien acknowledges and understands what he has done as a result of his drug use. He is willing to turn his life around by completing a drug program that will help him overcome circumstances and substances that cause him to become a drug addict.

If he is able to be released to a drug program he will have an opportunity to be a positive role model in his son's life. Learn life skills that will enable him to be a productive citizen, a loving and caring father.

I am of the opinion that given a chance Damien could be a dependable and stable individual.

If I can be of further assistance, please do not hesitate to contact me.

Respectfully,

Rev Daniel Stevens

Rev. Daniel Stevens



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien  McDaniel
*has successfully completed*
What The Bible Teaches
*by correspondence*

Grade: 92 %                                    1 Units

Oct 29, 2013

Mike Ausmus
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien  McDaniel
*has successfully completed*
God Is There
*by correspondence*

Grade: 99 %                                    1 Units

Dec 19, 2013

Mike Ausmus
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien  McDaniel
*has successfully completed*
Journey Through The Bible
*by correspondence*

Grade: 93 %                                    1 Units

Dec 31, 2013

Mike Ausmus



**ECS PRISON MINISTRY**
of Northern California

EMMAUS

NAV PRESS

SET FREE

MOODY

*This certifies that*
Damien McDaniel
*has successfully completed*
God Is There
*by correspondence*

*Grade:* 99 %

Dec 19, 2013

1 *Units*

*Mike Ausmus*
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

EMMAUS

NAV PRESS

SET FREE

MOODY

*This certifies that*
Damien McDaniel
*has successfully completed*
What The Bible Teaches
*by correspondence*

*Grade:* 92 %

Oct 29, 2013

1 *Units*

*Mike Ausmus*
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien McDaniel
*has successfully completed*
How To Succeed On The Streets
*by correspondence*

EMMAUS   SET FREE   NAV PRESS   MOODY

Grade: 93 %          1 Units

Feb 11, 2014

*Mike Ausmus*
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien McDaniel
*has successfully completed*
Doing Time With Jesus
*by correspondence*

EMMAUS   SET FREE   NAV PRESS   MOODY

Grade: 93 %          1 Units

Jan 16, 2014

*Mike Ausmus*
Correspondence School Director



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien McDaniel
*has successfully completed*
Journey Through The Bible
*by correspondence*

EMMAUS   SET FREE   NAV PRESS   MOODY

Grade: 93 %          1 Units

Dec 31, 2013

*Mike Ausmus*
Correspondence School Director







**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien  McDaniel
*has successfully completed*
I'll Take The High Road
*by correspondence*

Grade: 84 %

1 Units

May 12, 2014

*Mike Ausmus*
Correspondence School Director

EMMAUS
NAV PRESS
SET FREE
MOODY



**ECS PRISON MINISTRY**
of Northern California

*This certifies that*
Damien  McDaniel
*has successfully completed*
Lessons For Christian Living
*by correspondence*

Grade: 97 %

1 Units

Apr 7, 2014

*Mike Ausmus*
Correspondence School Director

EMMAUS
NAV PRESS
SET FREE
MOODY

# EXHIBIT 4

02172016ET8525

# State of California

# High School Equivalency Certificate

This is to certify that

# DAMIEN E. MCDANIEL

has met the standards established by the California State Board of Education for
successful completion of the tests of General Educational Development and is
therefore entitled to this High School Equivalency Certificate.



February 17, 2016

*Tom Tonlakson*    *Michael W. Kint*

State Superintendent of Public Instruction

President of the
California State Board of Education

This certificate is printed on secure paper that has a large California State seal watermark and a gold foil seal in the lower left corner

Case 4:13-cr-00818-PJH   Document 347   Filed 09/13/17   Page 28 of 79

# Tri-Valley Regional Occupational Program

# Certificate of Academic Achievement

The Regional Occupational Program is a career education program working
with the Dublin, Livermore and Pleasanton Unified School Districts.
The ROP recognizes that the following student

## Damien McDaniel

The Tri-Valley ROP is presenting this Certificate of
Academic Achievement for significant gains made on CASAS Pre and Post Testing.
Awarded on _February 9, 2016_

Fred Rutledge, Principal
Regional Occupational Programs

ROP
Tri-Valley

Teacher Judy
Program Instructor



# HIGH SCHOOL EQUIVALENCY TRANSCRIPT

### Issued under the authority of the California Department of Education

| | | | |
|---|---|---|---|
| FIRST NAME: | Damien | ADDRESS: 2172 50th Ave., | Issued by the California Dept. Education |
| LAST NAME: | McDaniel | | 1430 N Street |
| MIDDLE: | E | CITY: Oakland | Sacramento, CA 95814 |
| DATE OF BIRTH: | 12/02/1989 | STATE: CA     ZIP: 94601 | |
| ID NUMBER: | ****5200 | COUNTRY: USA | *John Boen* |

HSE Administrator

| TEST DESCRIPTION | DATE | SCORE | STATUS | LEVEL | LANGUAGE |
|---|---|---|---|---|---|
| ELA/Writing | 01/21/16 | 9 | Pass | 2 | English |
| Social Studies | 01/20/16 | 14 | Pass | 2 | English |
| Science | 01/20/16 | 8 | Pass | 2 | English |
| ELA/Reading | 01/21/16 | 14 | Pass | 2 | English |
| Mathematics | 02/17/16 | 9 | Pass | 2 | English |
| | SCORE TOTAL | 54 | Pass | | |

**TESTING CENTER:**

Alameda County Jail
Pleasanton USD
5325 Broder Blvd
Dublin, CA 94568

**TESTING CENTER ID:**

HSTP90066A

Performance Level 1: Below Passing
Performance Level 2: High School Equivalency
Performance Level 3: High School Equivalency with college and career readiness



To learn more about score scales and content descriptions please visit:
http://hiset.ets.org/scores/understand/

To order additional transcripts or certificates, please visit:
www.DiplomaSender.com

The scores on this report are the highest scores achieved by the candidate as of the last test date of 02/17/2016. If retest scores are lower than the scores previously achieved, the retest scores are not reported. Beginning 1/1/2014 HiSet test scores range from a low of 1 to a high of 20. Any alteration of this document renders it null and void.
Generated by DiplomaSender - www.DiplomaSender.com - Copyright © 2016 Lilac, LLC Doc Ver.140418 Generated: 2016-03-03 09:12:49

TRI VALLEY REGIONAL OCCUPATIONAL PROGRAMS
CORRECTIONAL EDUCATION
1040 FLORENCE ROAD, LIVERMORE CA 94550
(925) 455-4800

**COURT LETTER**
**Adult Secondary Education Program**

DATE: _May 10, 2016_

To Whom It May Concern:

The Adult Secondary Education high school equivalency diploma or HiSet
Program provides an opportunity for individuals to study and prepare for the
secondary education **diploma** examination. Passing the exam provides a
High School Equivalency diploma. The program is offered in a classroom
setting and through independent course work.

This letter serves to verify that _Damien McDaniel_
PFN number: _ULY036_ has volunteered to be a part of
the **diploma** program offered at the Alameda County Sheriff's Department
facilities in Dublin, Santa Rita Jail, and in Oakland, Glenn E. Dyer Jail. The
program is administered and taught by the staff of the Tri-Valley Regional
Occupational Programs, and the instructors are state certificated.

Sincerely,

_Teacher Judy_
**Adult Secondary Education Instructor**

**Invalid Without**
**Embossed Seal**

TRI VALLEY REGIONAL OCCUPATIONAL PROGRAMS
CORRECTIONAL EDUCATION
1040 FLORENCE ROAD, LIVERMORE CA 94550
(925) 455-4800

**COURT LETTER**
**Adult Secondary Education Program**

DATE: _June 28, 2016_

To Whom It May Concern:

The Adult Secondary Education high school equivalency diploma or HiSet
Program provides an opportunity for individuals to study and prepare for the
secondary education **diploma** examination. Passing the exam provides a
High School Equivalency diploma. The program is offered in a classroom
setting and through independent course work.

This letter serves to verify that _Damien McDaniel_
PFN number: _ULY036_ has volunteered to be a part of
the **diploma** program offered at the Alameda County Sheriff's Department
facilities in Dublin, Santa Rita Jail, and in Oakland, Glenn E. Dyer Jail. The
program is administered and taught by the staff of the Tri-Valley Regional
Occupational Programs, and the instructors are state certificated.

Sincerely,

_Teacher Judy_

**Adult Secondary Education Instructor**

**Invalid Without**
**Embossed Seal**

# Tri-Valley Regional Occupational Program
## Certificate of Distinction

The Regional Occupational Program is a career education program working
with the Dublin, Livermore, and Pleasanton Unified School Districts.
ROP presents an Academic Achievement Award in Adult Secondary Education to:

## Damien McDaniel

Successful Completion of 100 Assignments.

## Adult Secondary Education

Awarded on _____ June 28, 2016 _____

Fred Rutledge, Principal
Regional Occupational Programs

Teacher Judy
Program Instructor



**Office of Enrollment Services**
1-800-556-4559

# STRATFORD
### CAREER INSTITUTE
www.sci-careers.com

Damien McDaniel
Uly–036
550 6th St
Oakland CA   94607–3946

# SAVE $300
### When you enroll by
### October 3, 2016

Dear Damien McDaniel,

**Priority Code: 361171814**

As Director of Admissions at Stratford Career Institute, I want to introduce myself to you and thank you for contacting us.

We understand that choosing the diploma program that is best for you can be challenging, so I have enclosed our complete course list to help you decide.

No matter which program of study you choose, remember that furthering your education is always an exceptional way to help you work toward a lifetime of rewarding career success.

**Enroll now and receive an immediate $300 discount!**

In addition to getting $300 off the regular tuition price, you have also been pre–approved for Stratford's 0% interest monthly payment plan.

Everything you need to successfully graduate is included in your tuition and sent directly to you. Instructors are available via e–mail and toll–free phone if you need assistance. Exams can be taken online, through the mail, or in combination.

Follow these three easy steps to take·advantage of this special offer:

1. Look over the enclosed course list. Select the program that interests you most and write it on the enrollment agreement.

2. Fill out and sign and date the enrollment agreement.

3. Detach the agreement and mail it with your $10 down payment in the enclosed postage paid envelope.

Once I receive your enrollment agreement along with your down payment, I'll rush your first set of materials to you. It's that easy!

Sincerely,

Evelyn Daymond
Director of Admissions

## Why Choose Stratford?

### Convenient
Our guided, independent study format means that you train at home when you have time.

### Affordable
Graduate debt-free with our pay-as-you-go monthly payment plans and 0% financing.

### Practical
Career-focused training programs allow you to gain real world knowledge that can quickly be applied in the workforce.

### Trustworthy
More than one million students worldwide have already trusted us with their educational needs. You can, too.

---

## Three Easy Ways to Enroll!

 **CALL** 1-800-556-4559

 **CLICK** www.sci-careers.com

 **MAIL** your Enrollment Agreement

---

*Look inside for details about a special tuition discount!* ⟶

Mailing/Shipping: 1 Champlain Commons, Unit 3, P.O. Box 1560, Saint Albans, VT 05478
Main Office: 8675 Darnley Road, Mount Royal, QC H4T 1X2

# EXHIBIT 5

To the united states Federal Court of the
northern district of California.
And the honrable Justice Hamilton.
I Eugene Javon Hill Currently find myself
composing on behalf of Damien mcdaniel.
The above mentioned is a Individual that
I've had the opportunity to meet over a
period of over 2 years ago. Please allow me
to state that in those 2 years I've seen many
and great Changes and growth in me mcdaniel.
In the course of time - change - growth and
development I've come to know and call
me mcdaniel a friend. Please understand
that this isnt a mundane practice that I
compose on the behalf of others but this
is a situation that calls for such actions.
me mcdaniel has taken the time - Courage
and inative to set himself apart from others
and thier foolishness and work on himself
in trying to be a better father - son - brother -
friend all the while leading by example -
standing on fact - truth - and principle - inso doing
admitting and vocalizing his mistakes and
doing his best to Correct them. me mcdaniel
is a young gifted Individual with a lot to provide
those around him like myself. me mcdaniel
has seen me through my misgivings and has
pointed out the positive Changes that I
myself have made. I am greatful and
appreciative of mk mcdaniel. He has a lot

To provide in light of change in the
thought process and even greater in actions
he has gained his G.E.D. composed a
book and has expressed the desire
To mentor and advocate for the youth
here in the city of oakland. please Honorable
Justice this young man is a voice to
be heard and listen to. Honorable Justice
I ask that this young man situation be
in the mercy of the courts
Thank you for your time and consideration.
Eugene Aho—

# EXHIBIT 6

Dear Honorable Judge Hamilton,

Good Morning. I'm writing this letter because it's alot of stuff that I want you to know about me. I want you to hear it straight from the horses' mouth.

Honestly when I came to Jail I had my priorities all messed up, I was using heavy drugs and I wasn't taking care of what needed to be done. I've been messing up for A long time, but me being incarcerated this time has trully been A blessing in disguise and A real opportunity. Had I still been caught up in that lifestyle and that mentality it's no telling where I would be right now, but I guarantee I wouldn't be where I'm at mentally & academically.

Majority of the time I've been here I've been in Ad-seg and in Ad-seg there is no celly's and no contact with any other inmate's. Ultimately Ad-seg has been good for me because it has given A chance to spend time with myself that I've never had before therefore giving me time to think

P.2

without any interruption's and put my life into proper perspective.

Down here there are alot of inmate's who do things & say things to people because they know that no one can get to them. I say all that to say, after dealing with those type of individual's for so long and spending countless hour's of being mad, it came to the point to where I don't let those things bother me anymore. I've learned to control my anger in a real way even when I was on the mainline & faced with adversity. I showed discipline in my time of strife and handled such situation's with diplomacy. Now when a situation arise and I feel compelled to confront an individual, I have to take time & think about how to approach the situation without escalating it.

My Incarceration was and continues to be an opportunity for me to set goal's and formulate a plan for my life. Also, I realize that in order to achieve my goal's and execute my plans, that I have to want to do it. You could lead a horse

P.3

to water but you can't make him
drink. My life has substance to it
and it would be A shame to let it
sit & go to waste for so long.

The reason I say that my life has
substance to it is because, I've always
had A tendency to help people whether
it be for right or wrong. I Just have
A good heart. But now I don't want
to do anything wrong or assist in that
in any type of way, and I want to
put my energy into helping the youth.
I want to do volunteer work at
Juvenile Hall, camp and/or A group home
and I wish I could do it while I
still look young because that's one of
the best ways to get through to them.
I know they're not going to want to
hear anything about doing right from
someone who looks old.

I was once their age and I'm still
going through the things that they're
going through and I want them to see
that I'm Just like them, I come from
the same streets & lived the same life.
The things that they're doing I've done

P.4

already, I (can properly) speak the same (slang) language they speak. Honestly I wish I could go to Juvenile Hall right now as an inmate and live & program amongst them because I know they'll be curious and asking questions about my tattoo's, how old I am, why I'm in Juvenile Hall, how long I got, how long I've been down (incarcerated) etc......

And when they inquire I'm going to give it to them in A way that they'll understand because to them it's coming from peer-to-peer as oppose to staff-to-inmate or authority-to-inmate. But at the same time I want to get them to start thinking about their future and let them know that they don't have to do the stuff that they're out there doing. They could bend & brake the rules to the game all they want, but the results will always stay the same.

Honestly when I was 15 & 16-years-old I never thought I'd live to see 25 because it seemed so far away. I thought that I'd never get there. But I also want to start A non-profit organization

0.5

in the community for the kids and the youth to give them A place where they can come so they don't have to hang out in the street's. A place where they can learn how to apply for A job and I also want to be able to provide them with job's from one of my business's that I plan to open.

A couple of months ago I was talking to A young man (younger than me) who used to live the life that I used to live and with similar goal's, and I told him "after all the stuff we've been through maybe this is our purpose in life, to help the youngsta's". It's much bigger than me & my life and I know that I'm not going to be able to do everything, but the things that I am able to do will be significant enough to have an impact on them. Also, I want to be an active member in the community by going to city hall and listening to what they have to say and help offer some type of remedy to the issue's they address about my city.

Just because I'm from A neighborhood and I did illegal things "in" that neighborhood

P.6

doesn't mean that I did it "for" that neighborhood. I was A tenant at 1759 Seminary, nOt A trespasser and the owner at the time, Nancy Yuen, even told O.P.D that when they interviewed her.

It's obvious that if you're looking for the wrong in me when I'm doing wrong and living wrong then that's what you're going to get. And in the course of looking for the wrong you may overlook the right, the good and the normal things that I've done. Someone looking for the wrong in me may never acknowledge the fact that I helped an Old lady or two cross the street (I really did ☺), that I'm pushing the basket through the grocery Store while shopping with my lady, that I help my neighbor carry her groceries or laundry upstairs everytime she asked me to, that I'm sweeping up the sunflower seeds ³, cigarette butts outside my apartment's and the trash in the hallway's or that I'm Outside watering the grass and flower's.

I'd be expecting my lawyer to be A law

P.7

abiding citizen in society and that's what I'm looking for when I see him. But I may overlook the fact that he just Jay-walked or that he's talking on his cell phone while he's driving. I may see it but not realize that it's illegal because I'm not looking for that in him. Do you get what I'm saying, ma'am? I was living scandalous but I'm not A scandalous type individual. Those things does not define who I am, that's where my head was at but that's not where my heart was at. There's more to me than the crimes.

Sometimes I can't fully express how I feel verbally because I can't always find the right words, but my letters to the victims is how I really feel. Honestly I get mad when I talk about those situation's because I regret so much that I did those stupid things and it landed me in Jail. Being in Jail, prison is me paying my debt to society, but I believe remorse, ammending my wrongs to the victim's is one of the best, if not the best way to pay my debts to

P.8

the victims. The victims need to benefit
from me by knowing that I'm sincerely
remorseful about my actions. The community
needs to benefit by getting an offender
off the streets until he's truly ready
to re-enter. And the offender (I) needs
to benefit by understanding what I've
done, how's it's impacted my community and
work towards not committing another
transgression against my community or
anyone else.

My anxiety really bothers me because all
day long they're slamming doors. I try to
brace myself everytime because I know
they're about to slam it but my nerve's
jump everytime. I always think of the
worst when I hear an abnormal noise.
A couple of weeks ago one morning,
somebody slid A book under my door while
I was sleep; it wasn't A loud noise at
all but it made A "shhh" sound; it scared
the life out of me because it reminded
me of somebody creeping through some
bushes. I don't even know how that came
to my mind so fast, but it was going through
my head by the time I sat up.

P. 9

I have family member's that I haven't
seen or spoken to since my grandmother
died in 2006 and to an extent I feel
like I've turned my back on them, but
throughout my incarceration they've
still been supportive. I'm very thankful
for them and when I think about it
sometimes it makes me want to cry
because I feel like I don't deserve
them but they're still there for me.
It feels like I've done them wrong but
they're still showing their love for me
and being nice.

My time here on earth is only
temporary and as I get older I think
more about what's going to happen to
my soul when I die. Regardless of
whatever happens or has happened, I
want to right my wrongs, learn how to
forgive and live my life as pure as possible
because I want my soul to be at peace.
I'll be 30-years-old in less than 30
months and before I came to jail I
never thought I'd live to see 30. And if
I ever did, I always had a preconceived
notion that I needed to be living the
"American Dream" by then with the

P. 10

White picket fence, the family's the dog.

I really want to get out of Oakland. I've never even been in the snow, I've been stuck in East Oakland all my life. When I was 17-years-old I was in A boy's ranch in Southern California for 8 1/2 months and honestly I loved it there. That was 10 years ago and I still have dreams about that place. It felt like A college to me because it was three boys to A room. We went to school on the campus, we had A basketball gym, A weight room, A big nine feet deep swimming pool, pool tables, video games and best of all, I was A starting player on the football team. On offense I was doing kick off's, punts and running back and on defense I was playing linebacker. And our team wasn't Just boys from the Bay Area, we had boys from South Central, Long Beach, Bakersfield, Pasadena. So it was fun to mingle amongst and get to know them.

While dealing with group homes, Boys

P.11

ranch, drug programs and prior jail/prison stints, although I didn't want to end up back in those situations once I was released, I never had intentions on giving up the life I was living. My mindset was, "not coming back to jail" not "stop doing the thing that sent me to jail".

In 2014 my son was adopted by two gay men and initially I wasn't comfortable with that. After realizing that they were the only way that I was going to have any contact with my son, I reached out to them and began building a rapport with them. Throughout our time corresponding I've gained alot of love & respect for them because I see that they genuinely love my son as if he were their own. And honestly I wouldn't have the situation any other way for that reason alone. And also because they're providing my son with a life that no one I know could have. Before I reached out to them I was afraid that they weren't going to let me see or talk to my son. I accept them for who they are and they

P.12

actually came to visit me A couple of
weeks ago. They were thinking about
bringing my son to come visit me
but they wanted to do A test run
first to see how visiting was set up,
but I told them that I didn't want
him to come and see me behind the
glass with chains on because I care
too much about him feelings and I
don't want this image to be in his
head. I've seen my dad in handcuffs
alot of times and each time I've felt
sad because I couldn't help him. I don't
want my son to feel the same way.


When I'm released from prison I
want to start my own businesses
and I already have A well elaborated
plan to get them started. While I'm
in prison I want to take business
management classes and any other
business classes because I need to
know the total ins : outs to running
A business.


Thank you Judge Hamilton for taking
the time to read my letter and I
hope that I was able to shed more

P.13

insight as to who I am as an
individual and what I'm going to do
with my life. I send my utmost
respects to you, ma'am. Have A blessed
day.

Sincerely,
Damien McDaniel

Hon. Judge Hamilton,

I'm writing this letter to you because I can't write it to Raven Burnette.

For me to say that I made. A mistake would be an understatement. I've done wrong. Period. Point. Blank. Words or apologies could never restore. you to your natural state, and if you can hear & understand what I'm saying, I want to apologize for my actions and ask for forgiveness from you and your family.

During my time incarcerated I've often put myself in your shoes and imagined the horror you probably went through not knowing if this could be the last chance to see your family, and wondering if I would be the last person you would encounter. When I think about it, I come to understand how scared you were because it's hard for me to picture not knowing if I would ever see my family again and if I would be the last person that I would encounter. Just the thought of all that is more than enough to seriously re-evaluate my life and how I'm living because I had my priorities all messed up.

P. 2

I could never fully comprehend the pain that I've caused you and your family, not to mention the community as well as my own family. My actions were really selfish and inconsiderate. You are somebody's son, somebody's brother and maybe somebody's dad, and I have no right to try to take you away from them.

I've been in here working on myself to prevent myself from being involved in any type of violence again. I plan on working with the community and reaching out to the youth, so we can prevent more people from dying and being harmed by the violence. I know that everybody isn't going to listen, but as long as I get through to one person out of every 10, that's one less criminal and one less victim, and one step closer to having a safer community.

My ultimate goal is to help more lives than I've hurt and to make amends with those that I have hurt. It's a restorative justice thing with me, and by me working with the youth is my way of asking for forgiveness from the community.

However much time I have to do in prison

P.3

I'll continue to utilize the opportunity and
Work on bettering myself so that I can
help other people. I hope you and everyone
else who has been affected by my actions,
can find it in your hearts to forgive me
but if not I'll understand. I wish you the
best.

Sincerely,
— Damien —

Dear Mr. Karsseboom,

Please excuse the intrusion, but allow me to reintroduce myself in a more formal manner. My name is Damien McDaniel.

I want to apologize & offer my condolence for the harm I've caused you and your family back in January of 2013 when I shot you. Ultimately I know that I was wrong, and if you can find it in your heart to forgive me I ask that you please do because I can admit when I'm wrong.

In January of 2013, I was 23-years-old, but I still acted like a teenager and I was in denial about myself. It's been a long and hard stay here at this facility because I've dealt with so much within myself, but at the end of the day, I feel like in order to get where I'm at mentally, I had to go through the stress & frustration. It wasn't easy, but those were the obstacles that I had to go through to become a better person. I've set goals and I made a plan for my life that I hope to achieve one

P.2

day.

Whether you forgive me or not, I'm man enough now to admit when I'm wrong and accept responsibility for my actions. I've learned from my mistakes / wrongdoings and I'm utilizing this opportunity (my incarceration) to better myself and grow.

I hope this letter brings you some closure. Have A good day. Over + out.

Sincerely,

-Damian-

# EXHIBIT 7

Dear Judge Hamilton,

This is Lynn Edward Mcdaniel, I am writing this letter in light of my young son Damien Edward Mcdaniel's current unfortunate situation which, without ignoring Damien's accountability, I would like to explain to you my contribution. Although I am now a hardworking, clear-headed, man of faith and God, the severity of this current sentencing has forced me to self-reflect on my past and how it came to effect Damien's present.

To summarize my childhood; I grew up in Oakland, California, in a 2 bedroom house on 84th avenue - the hood, you could say. I lived in this home with 6 siblings and only my father's income to share amongst us. It goes without saying this was not enough to survive and I realized pretty fast I had to provide for myself. (It was that or eat cornbread, mayonnaise sandwiches, or ride for dinner every night).  But with my young age, limited education and opportunity, I turned to hustlin'. Petty crimes that eventually evolved into things that required me to ignore my morals until they no longer became a problem for me. The backlash of this lead me into a life of low-self esteem, hard drugs, crime and becoming a young, unprepared father. Preoccupied with all the stupid things I was doing, I didn't realize I was setting up Damien to grow up in a similar environment that I did, and unfortunately, make similar bad choices. I chopped it up as something he'd grow out of, maybe to soothe guilt I'd trained myself to ignore, either way I was wrong. Without guidance from a much needed father, a lot of Damien's youth fell to gangs and crime.

About 4 to 5 years ago when he was released from jail, though I had changed my life for the better (married, job and a home I pay bills in), I dropped the ball again. He wanted to live with me, but I felt the neighborhood wouldn't have been conducive to the growth I saw in him. Unknowingly, I pushed him right back into the neighborhood he was in before he went into jail. I see my mistakes clearer than ever, and I'm writing this letter to ask you to not only give Damien a chance with a reduced sentence, but with it also redemption for myself. I am 50 years old and I want an opportunity to get it right. Talking to Damien these years he has been awaiting his sentencing has showed us both the potential for redemption and change.

Thank you,
Lynn McDaniel

# EXHIBIT 8

Dear Honorable Judge: Hamilton

Hello, my name is Korine Ritter. I am writing this letter on behalf of my child's father Damien McDaniel. I met Damien 9 1/2 years ago. At that time, he was an extremely different person, the Damien he was 4 years ago was not the Damien he was when I met him. I can't and will not justify any of Mr. McDaniel's behaviors yet I will say the Damien I know is not the man a lot of people are thinking him to be. When I first met Mr. McDaniel he was a reliable man who I could always count on to be at home every night by 10-10:30pm instead out all night engaging in criminal and addictive behaviors. When our son was a baby Mr. McDaniel was an active part of his life whenever he had the chance to be. Our son was removed from my care by cps in the year of 2011, Mr. McDaniel was incarcerated at this time so he was not able to fight for our son the way I was able to. Following the removal of our son by cps Mr. McDaniel's behaviors changed rapidly in a negative way his way of coping with the situation was by engaging in criminal and addictive behaviors and acting out of impulse. I myself coped with the situation by turning to drugs. I blamed Mr. McDaniel for a very long time for our son being took when it was not his fault. I fought for our son for a long time and in the end, I still lost and he was adopted out. I can't speak on Mr. McDaniel's behaviors before I met him or on the alleged charges I can only speak about the man I met 9 1/2 years ago, the man I know is a great father and if given the chance can become a productive member of society if he is able to change people places and things. I am currently in a inpatient drug program with almost 8months under my belt. Today I have tools and coping skills that I never had before. If Mr. McDaniel would agree I honestly believe that an inpatient drug program working around substance abuse, Criminal and addictive behaviors, anger management etc. would be ideal for him so he can become that man I once knew and the man I know he can be. My honest opinion is prison is not going to help him all the way he needs a program where he can learn tools and coping mechanisms. In the end, the decision will be up to you I hope you can take into consideration my idea around an inpatient drug program for a 1+ years for Mr. McDaniel. Thank you for taking the time to read this letter and consider my opinion and viewpoints.

Thank you for your time and consideration in this matter.

Korine Ritter

# EXHIBIT 9

From: **<Manager.022@cpwm.com>** Manager.022@cpwm.com
Subject: **World Market - Thank you please call us at your earliest convenience**
Date: **Oct 28, 2016, 3:44:48 PM**
To: **<vaughnslaw@aol.com>** vaughnslaw@aol.com

Damien McDaniel,

Thank you for your interest in CPWM. I would be interested in speaking with you at your earliest convenience regarding some opportunities that might be of interest to you. I look forward to hearing from you. Please ask for the manager on Duty to set up an interview.


Chelsea Youngren General Manager

# EXHIBIT 10

**From:** The Commonwealth Club, Membership
**Sent:** Thursday, May 4, 2017 11:21 AM
**To:** Damien McDaniel #ULY036
**Subject:** Membership Payment - Application Received

Membership Receipt - Tax Information



Our Website                                                                                                                   *save this email*

# Membership Receipt

Dear Damien,

Thank you for submitting your membership application!  We are glad to have you as a member, and appreciate your support.

We are working quickly to complete the final steps to activate your membership.  (Still a manual process internally - please allow up to two business days). After your membership has been activated you will receive an email with your membership number.  With that, you'll be able to purchase tickets online and receive special member pricing.

In the mean time please call our box office to secure tickets right away.  They can help you reserve tickets, with special member pricing, over the phone.

Box Office: (415) 597-6705

**Below is a summary of your gift.**
**Amount:** $ 99.00
**Payment Method:** ▓Visa Credit Card, 730▓
**Date:** 5/4/2017

No goods or services were received in exchange for your membership, which was used entirely to support The Club's activities.  The Club is a 501(c)(3) organization, and our federal tax ID# is 94-0399260.  Your membership dues are considered a tax deductible contribution.

If you have any questions please contact us at (415) 597-6708 or by emailing membership@commonwealthclub.org.

From,

The Membership Team

**P.S.  Maximize the impact of your membership with a matching gift!  As a registered 501(c)(3), the Commonwealth Club is eligible for <u>many employers' corporate matching gifts programs</u>.  Check with your employer to see if they match gifts; it's a simple way to make your membership go further.**

555 Post Street
San Francisco, CA 94102
info@commonwealthclub.org

To unsubscribe, please reply with 'remove' in the subject line.

Privacy Policy  |  Email Preferences
© The Commonwealth Club of California, 2016

# EXHIBIT 11

# EveningStandard. 

News › London

# London adventurer Lia Ditton to become first woman to row solo across Pacific

**BARNEY DAVIS** | Friday 16 September 2016 09:49 |    **1 comment**



Like    Click to follow
The Evening Standard



Charting a course: Lia Ditton training for her 5,500-mile voyage from Japan to San Francisco *Julian Winslow*

**An adventurer from London is preparing to battle typhoons and her parents' disapproval to become the first woman to row solo non-stop across the Pacific.**

Lia Ditton, 36, will set out from Japan next May on the 5,500-mile voyage to San Francisco's Golden Gate Bridge. Ms Ditton has clocked up more than 150,000 nautical miles in a sailing career – equivalent to eight laps of the globe – and expects the journey to take from four to six months "depending on the currents".

She said: "The impossibility of it is definitely part of the appeal. Sixteen men have failed, by either starting from the wrong position or not having the right gear.

**READ MORE**

Moment two young rowers rescued from Thames after boat capsizes

Oxford rowers rescued by lifeboat crew just 10 days before the Boat Race 2015

Olympic gold medal-winning rower Katherine Grainger: Unfinished business motivated my return to the sport

She narrowly avoided Hurricane Katrina while racing in the Atlantic in 2005, and will draw on that experience as she charts a course across the Pacific.

Ms Ditton, who studied at the Chelsea College of Art in the Nineties, is expected to lose 30lbs on the journey and will have very little room on her 21ft boat for luxuries from home. She added: "My parents hope it doesn't happen. They've only just got used to me sailing across oceans so rowing across one has maybe pushed them too far – but my brother is behind me 100 per cent."

She has also received £20,000 as a gift from Dragon's Den star and Yo! Sushi pioneer Simon Woodroffe, who is sponsoring her attempt.

Ms Ditton said: "I'll go down in history. Four men have succeeded but I want to inspire women everywhere."

More about: | Pacific Ocean

 Reuse content

Sponsored Links by Taboola

The Surprising Reason Behind Dollar Shave Club's Change
Dollar Shave Club

Reclusive Millionaire Warns Retirees: "Get Out Of Cash Now"
DailyWealth

Homeowners Born Before 1985 Are Getting A Huge Reward
Clever Economy Quotes

Best & Worst Home Solar Companies Finally Ranked.
Best Company

Get The Care You Need Without the ER from Sutter Health
Sutter Health

This $199 Golf Driver is Changing the Game For Amateurs
GX7 Golf

These are the rules at Prince George's new school Thomas's Battersea

# EXHIBIT 12

What Do I Want To Start?

- A Car Repo business
- A Tow Truck business
- A Pool Hall business
- A Used Car lot business
- A Beauty Supply business
- A Shoe Store business
- A Clothes Store business
- A Car Service Company
- A Foreign Car dealership
- Learn how to get involved in Real Estate

The Right thought plus the Right people in the Right Environment at the Right time for the Right Reason = The Right Result.

Q.2

1) List all of the estimated costs to run the business on a monthly basis. Rent and Salaries. Will be my largest operating expenses.

2) Identify the start-up costs:
- Alcohol Lincense for the premises
- Securing the location (Landlord may want an upfront deposit - for example: 2-3 months rent)
- Equipment (food handling/preparation, pool tables, shoes, Tow trucks, hair products etc.....)

Revenue :   $ Month 1   $ Month 2   $ Month 3   $ Month 4 .....   $ Month 12

- Food & Beverage

- Table Rental

- Hair Products

- Shoes

Total Revenue =          =          =          =          =

Operating Expenses :
- Rent
- Salaries
- Insurance
- Utilities
- Maintenance
- Other

Total
Operating Expenses  =          =          =          =          =

Net Income (Loss) $ =      $ =      $ =      $ =      $ =

Assumptions :
- How many Patrons/ Day ?
- How much each patron spend ?
- How many hours will I be open ?

Cost Assumptions:

Salaries —

Operating 12 hours/Day
w/ 1 hour before opening
& 1 hour after closing
Total 14 hours
2 Employees per shift (7 hour shifts)
= 28 Man hours/Day
× $15.00 min Wage/Day
$420/Day × 30 days = 12,600 Salaries/Month


Rent —
2,000 Square feet
$3.00 per square foot
$6,000 Rent/Month

The above 2 monthly Expenses total about

18,600/Month

ADD other Expenses for

Insurance

Utilities

Maintenance

Other

- Beauty supply, clothes store, shoe store

After I get my business licenses, wholesale license. etc...... Go online & see how I can buy authentic Ralph Lauren, True Religion and whatever else they're wearing out there and buy it wholesale.

Once I learn the game A lil more, turn it up A notch and do the samething with expensive designer labels like Gucci, Louie V, Fendi, Prada, Dior, Versace, Farragamo, etc.....

Location! Location! Location!
See what the competition is looking like in the Silicon Valley, find A location & set up shop with some of the hottest deals that this Valley has to offer.

I gotta have A plan on the deals for the first 2 months, by the time those 2 months are over I already have to have another plan in motion for the following 6 months. When those 6 months are over, I gotta have A plan for the next 8 months. Then after that it's the next 12 months. It's not about the profit it's about the turnover.

# Building Credit

Go to credit card.com get A secured credit card it could be visa, Master or both. Open A personal bank account at A credit union. After 6 months of building credit go to credit card.com and apply for unsecured credit card. Macy's, JC Penny's, Toy's R Us, Blooming Dale's.

- Used car lot/foreign Car dealership/Car service
  After I get my business license, dealership
  license etc..... Rent or buy an empty lot
  Somewhere, start advertising then buy used
  cars from the auction.

- Learn how to deal with the credit checks & all that.

- When I sell enough used cars and make A
  good enough profit, I can either start selling
  foreign cars off that same lot or rent
  (or buy) another lot and open up A real
  dealership. I rather buy another lot and
  open up A fresh dealership with foreign
  cars.

I want to do it just how I did with the
clothes & shoe store, start basic and work
my way up. And eventually I'll start by using
some foreign cars to start up A car service
company or something like UBER or LYFT
but with foreign cars only. I need to find
out how much UBER & LYFT charge their Riders
and try to beat their prices. It's not about
the profit it's about the turnover.

# EXHIBIT 13

JANET L. MAXWELL

6114 LaSalle Ave. Suite 357
Oakland, CA 94611
510-593-6966

September 4, 2017

Dear Hon. Phyllis J. Hamilton,

I am writing to voice my opinion about Mr. Damien McDaniel.

I met Mr. McDaniel when I was appointed to serve as his attorney's paralegal. Initially, my job was to review the voluminous discovery materials with Mr. McDaniel at the Glen Dyer Jail. We went through many hours of reviewing documents, surveillance videos, and audio recordings. During those hours, Mr. McDaniel was unfailingly polite and respectful. Often, he would apologize for his appearance or ask for forgiveness if he coughed. I found him to be very different from other inmates with whom I had previous contact in that he is very thoughtful and remarkably straightforward.

We began to discuss matters beyond his case while we watched lengthy videos. He expressed many opinions about his life and his future plans. While many other inmates become fixated on rewriting history and glossing over their past transgressions, Mr. McDaniel was quite different. He candidly acknowledged his past and made no excuses for it. Many times he has stated that he is "tired of running from his problems" and that he wants to be more productive with his time by getting a GED and job training. I feel that he is very dedicated to making his future a better one for himself and for his son.

He would ask me questions about my life and the path I had traveled to be where I am. He was fascinated to find out that I have a background in psychology. We would have many discussions about psychology and he showed an honest interest in studying the topic. Motivated by his eagerness to learn, I purchased and mailed several books to him. He was very appreciative of this and would tell me about the different chapters he would read. He became very interested in the topic regarding the development of an adolescent males psyche. It was very enlightening for him to learn that he wasn't alone or unusual in the thoughts or behaviors he had as a teen.

I believe he feels that he has matured quite a bit since the beginning of his incarceration until now. Due to his need to use his pent up energy and time more productively while in isolation, I sent him an adult coloring book of mandalas. This is a useful tool originally used by Buddhists for meditation and introspection. It also provides stress relief, peacefulness, and a creative outlet. He has found it to be very effective in dealing with his thoughts and emotions in a more positive way. He expressed a desire to develop a spiritual side to himself as well being in the service of others.

One of his goals was to be apart of the Little League organization in order to help kids like himself have a outlet for a different outcome than he had. Over time, his opinions have evolved and he has begun to adopt a realistic view of his past and his prospects for the future. He went from thinking of getting out of jail and getting into the music industry to trying to find out which federal prisons offered the best practical vocational training programs. We discussed many options for possible jobs that would compliment his interests and strengths. He realized that he must make a fundamental change both inside of himself as well as outside. He understands that he must completely eradicate any negative influences in his life whether it be people or places.

From our many discussions, I know Mr. McDaniel looks forward to proving he can be a good and productive person. Whether it was proving it to his family, to his friends, or even to the prosecutor, his consistent theme was to show everyone that he could rise above his past. He expressed a deep desire to show how he has matured and what his potential could be after serving his sentence. I look forward to seeing him succeed in the future because I know he can

Sincerely,

JANET MAXWELL